FILED

2017 Feb-01  AM 08:14
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| **KIMBERLY LAVENDER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | Civil Action Number |
| | ) | **2:15-cv-02275-AKK** |
| **PROTECTIVE LIFE** | ) | |
| **CORPORATION,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Presently before the court is Protective Life Corporation's motion to disqualify Kimberly Lavender's counsel, Reginald McDaniel and the McDaniel Law Firm, LLC, doc. 17, and various other related motions.[1] The motion to disqualify is fully briefed, docs. 51; 62; 63; 65, and ripe for review after a hearing and oral argument. For the reasons stated below, Protective's motion is due to be granted, and McDaniel and all attorneys at the McDaniel Law Firm, LLC,

---

[1] McDaniel's motion for expedited discovery, doc. 38, and to depose Kate Cotton and Scott Adams, doc. 44, are **MOOT** in light of the court's October 6, 2016 order, *see* doc. 56, and the September 26, 2016 hearing, *see* doc. 64 at 44.

Protective's motions for appropriate relief, doc. 41, to compel discovery from Beeman, doc. 45, and to compel discovery from Lavender, doc. 46, are **DENIED AS MOOT**.

McDaniel's motion for sanctions, doc. 47, is **DENIED** for failure to show good cause, and Beeman's motion to file under seal, doc. 61, is **GRANTED**.

Finally, McDaniel's motion in opposition to supplement the record, doc. 73, is **GRANTED**, and Protective's motion to supplement, doc. 69, is **DENIED**.

including Robert Beeman, are disqualified from representing Lavender in this case.

## I.     PROCEDURAL BACKGROUND

Kimberly Lavender, a former employee of Protective Life, filed this lawsuit, alleging race discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. Doc. 1. Lavender is represented by Reginald McDaniel, based on a referral by her then coworker, Robert Beeman, Esquire. Doc. 65-5 at 109. Beeman, a licensed lawyer, was an officer at Protective until he resigned when Protective confronted him about his involvement in this case. In a nutshell, Protective asserts that Beeman provided legal representation to Lavender by working on her case while employed at Protective, even though he previously served as legal counsel to Protective on similar discrimination matters. Doc. 17. To support its contentions, Protective presents evidence suggesting that Beeman and McDaniel are partners at the McDaniel Law Firm, LLC. Based on this partnership and evidence that Beeman worked on this case, Protective asserts that Beeman violated Rules 1.7 and 1.9 of the Alabama Rules of Professional Conduct, and that, pursuant to Rule 1.10, McDaniel and the McDaniel Law Firm, LLC are disqualified from representing Lavender in this action based on Beeman's association with the law firm. *See generally* doc. 51.[2]

---

[2] Protective also asserts that Beeman and McDaniel committed additional conflicts of interest violations in opposing Protective's Motion to Disqualify and for Other Appropriate Relief, doc. 17. Doc. 51 at 20. Protective purports that Beeman and McDaniel violated Rules 3.3. and 8.4(c)

## II.   FACTUAL BACKGROUND

Beeman worked at Protective for over eighteen years. Doc. 17 at 25. Starting in 1998, Beeman served as associate counsel and ultimately senior associate counsel in the Legal Department. Doc. 65-5 at 55. For "six or seven years" as associate counsel, Beeman counseled the Human Resources Department by working with the chief HR officer to address employee grievances and "thorny" personnel decisions, to investigate discrimination and employment complaints, respond to EEOC charges, and implement and ensure compliance with HR policies. *Id.* at 55–56. During this period, Beeman was the primary contact person for ten employment lawsuits, including six involving discrimination allegations. Doc. 65-5 at 59–62.[3]

In March 2003, Beeman transitioned to the HR Department. Docs. 62-2 at 3; 65-5 at 57. In his new role, although Beeman still worked as senior associate counsel, he became the primary attorney for the HR Department. Docs. 62-2 at 3;

---

of the Alabama Rules of Professional Conduct and the ABA Model Rules of Professional Conduct, by misrepresenting the nature of their relationship and Beeman's involvement in this lawsuit. *Id.* More, Protective asserts that Beeman and McDaniel violated Rule 37 of the Fed. R. Civ. P. by refusing to comply with the repeated orders of the Court to submit to discovery. *Id.* at 21; *see also* docs. 24; 26; 30; 31; 34; 41; 45. In light of the finding that the motion to disqualify is due to be granted, the court sees no reason to address these issues.

[3] In fact, in 2002, Beeman authored "Requests for Production" on behalf of Protective in a discrimination lawsuit and authored a memorandum summarizing all EEOC charges and lawsuits filed against Protective since 1999. Doc. 65-5 at 66. In a 2004 document titled "Robert Beeman's Accomplishments," Beeman outlined his responsibilities at Protective: "[s]erved as primary attorney to HR" and for new HIPAA requirements, revised Protective's code of conduct, and "[h]andled essentially all non-litigation HR matters and personnel-related investigations (which includes EEOC charge investigations and responses)." *Id.* at 77.

65-5 at 47. Beeman worked primarily on employment matters and policies for the next three years. Docs. 62-2 at 3; 65-5 at 57. For example, Beeman wrote in his 2005 "Annual Performance Review Memo" that he "served as primary legal counsel to HR," that Protective only had one EEOC charge in 2004, that he "assumed sole and full responsibility for interpleader related actions," and "served as in-house HIPAA counsel." Doc. 65-5 at 82–83. From 2002 to 2006, Beeman "authored at least seven legal update memos including information on legal developments and updates on the number and type of EEOC charges and lawsuits that Protective . . . had pending at that time." *Id.* at 66.

Around May 2005, Protective promoted Beeman to Second Vice President. *Id.* at 57. In this role, Beeman attended quarterly meetings with over one hundred other vice presidents. *Id.* at 103. Around that same time, Beeman transitioned to a non-legal position, working in an ethics, diversity, and compliance position within the HR Department. Docs. 62-2 at 3; 65-5 at 57. In that role, Beeman worked on diversity initiatives, compliance with and the review and modification of Protective's business code of ethics, and helped determine what employee-related conflicts of interest, if any, the company needed to resolve. Doc. 65-5 at 102.

In 2010 or 2011, Beeman moved laterally to the Protective Life Foundation, and, on May 9, 2011, Protective also appointed Beeman as an officer of the company. *Id.* at 103, 139, 145. As a Second Vice President and officer of

4

Protective, "Beeman was eligible to receive a bonus based on the financial success of Protective . . . on a yearly basis." *Id.* at 139. At the Foundation, Beeman worked as a loaned executive to United Way and also helped with Protective's corporate charitable initiatives. *Id.* at 103. Beeman worked in this role until his resignation on August 23, 2016. Doc. 17 at 25.

Beeman met McDaniel at some point in the last three years. Doc. 65-5 at 103. Beeman and McDaniel apparently discussed working together because in May of 2014, McDaniel posted the following on his firm's Facebook page: "Happy to announce a new partnership with my Harvard Law School partner, Robert L. Beeman, Esq. Miles Law School and Harvard coming together to form a formidable legal team!" Docs. 17 at 19; 65-5 at 104. Consistent with their discussions, sometime in 2014 — and while still employed at Protective, Beeman became "of counsel" to McDaniel's law firm. Doc. 65-5 at 107. Around that same time, Beeman also rented office space at the same address as McDaniel's law firm, and there is evidence to support that Beeman and McDaniel have presented themselves to clients as law partners. *See id.* at 111; docs. 17 at 16, 19; 65-2 at 33–35, 39–67; 65-9 at 173–184. Beeman has worked and currently is working with McDaniel on other legal matters. Docs. 65-5 at 104; 65-9 at 40–41, 83. However, Beeman states he and McDaniel never formed a legal partnership. Doc. 65-5 at 107.

As to Lavender's case, while still an employee and an officer at Protective, Beeman worked on Lavender's lawsuit by, among other things, helping McDaniel draft a letter to the EEOC relating to Lavender's claims and damages against Protective. *Id.* at 109. In fact, Beeman acknowledges that he represented Lavender in her dispute against Protective and that his role as her chief counsel only ceased when he referred her case to McDaniel:

> Q: At what point did you believe that you ceased to be her lawyer?

> A: Certainly in any representative capacity, probably until she met with Mr. McDaniel.

*Id.* at 110. However, there is evidence showing that Beeman continued to represent Lavender afterwards. Specifically, Beeman helped McDaniel draft the complaint and the Rule 30(b)(6) deposition notice to Protective in this case. *Id.* at 109, 118– 119. Indeed, despite Lavender's adverse interests to Protective, Beeman communicated with McDaniel about this case in person and via e-mail, because "[Beeman's] intent was to help Mr. McDaniel." *Id.* at 118. Moreover, Beeman, McDaniel, and Lavender have met on at least two occasions to discuss Lavender's case. *Id.* at 111–12. Beeman states, however, that he never disclosed to Lavender his affiliation with McDaniel's law firm. *Id.* at 111.

On August 22, 2016, Beeman's supervisor, Kate Cotton, found a fax on her desk that Beeman sent to McDaniel from Protective's facsimile machine, regarding a separate legal matter. Docs. 17 at 2; 52 at 32. Cotton handed the document to

6

Wendy Evesque, Chief HR Director. Doc. 52 at 32. Because Protective recognized McDaniel as Lavender's counsel in this case, Protective initiated an investigation that led to it discovering that the McDaniel Law Firm had Beeman listed as an attorney on its website and as a partner of the law firm on its Facebook page. Docs. 17 at 2–3, 17, 19; 52 at 33–34. Although Protective's conflict of interest policy required that he do so, Beeman never disclosed to Protective that he performed outside legal work or that he received compensation for such work and referrals. *Id.* at 3, 21–23. In light of the information, the IT Department conducted a search of Protective's server for e-mails relating to McDaniel and found an exchange between Beeman and McDaniel related to the Lavender case. Doc. 52 at 35.

When Evesque and Senior Associate Counsel Amy Savoie questioned Beeman about these findings, Beeman denied any affiliation with McDaniel's firm or that he had communicated with McDaniel about Lavender's case outside of the referral. Docs. 17 at 2–3; 52 at 37–38. Shortly after Evesque informed Beeman of the decision to suspend him with pay pending an investigation, docs. 17 at 2–3; 52 at 39, Beeman resigned, stating in part:

> After 18 plus years of service to Protective Life Corporation, I deem it appropriate at this time to resign my employment. I do not feel this is where my final and most productive working years should be spent. I have serious concerns about the manner in which employees are treated and the complexion of the organization.
>
> This decision is *effective immediately* and with no restraints on the practice of law and who I may choose to accept or take on as a client.

7

Docs. 17 at 4, 25 (emphasis added); 52 at 39.

Following Beeman's abrupt departure, Protective searched Beeman's office and discovered evidence on Beeman's computer that he was actively involved in a number of outside legal cases, some of which were in collaboration with McDaniel, including this lawsuit. Docs. 17 at 4–5; 52 at 40–41. The evidence included drafts of the complaint in this case, requests for interrogatories and a deposition notice to Protective, and draft correspondence to the EEOC regarding Lavender's EEOC charge against Protective. Docs. 17 at 5; 52 at 42.

The discovery of Beeman's involvement in this case led to the filing of the emergency motion to disqualify McDaniel, Lavender's counsel of record. In the motion, Protective alleges that Beeman and McDaniel violated Alabama Rules of Professional Conduct 1.7(b),[4] 1.9,[5] and 1.10(a).[6] The court has adopted these rules

---

[4] Rule 1.7(b) provides:

> (b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or a third person, or by the lawyer's own interests, unless:
>
> > (1) The lawyer reasonably believes the representation will not be adversely affected; and
> >
> > (2) The client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

[5] Rule 1.9 provides:

A lawyer who has formerly represented a client in a matter shall not thereafter:

through its local rules which require, in part, "[e]ach attorney . . . who appears in this court . . . to be familiar with, and shall be governed by, the Local Rules of this court and, to the extent not inconsistent with the preceding, the Alabama Rules of Professional Conduct adopted by the Alabama Supreme Court; . . . ." L.R. 83.1(f). The court will now address the merits of the motion.

## III.   STANDARD OF REVIEW

"Motions to disqualify are governed by two sources of authority. First, attorneys are bound by the local rules of the court in which they appear . . . . Second, federal common law also governs attorneys' professional conduct because motions to disqualify are substantive motions affecting the rights of the parties." *Herrmann v. GutterGuard, Inc.*, 199 F. App'x 745, 752 (11th Cir. 2006) (citations omitted). "The party bringing the motion to disqualify bears the burden of proving the grounds for disqualification." *Herrmann*, 199 F. App'x at 752 (citing *In re*

---

(a) Represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client, unless the former client consents after consultation; or

(b) Use information relating to the representation to the disadvantage of the former client except as Rule 1.6 or Rule 3.3 would permit or require with respect to a client or when the information has become generally known.

[6] Rule 1.10(a) provides:

While lawyers are associated in a firm, none of them shall knowingly represent a client when any of them, practicing alone, would be prohibited from doing so by Rules 1.7, 1.8(a)–1.8(k), 1.9, or 2.2.

*BellSouth Corp.*, 334 F.3d 941, 961 (11th Cir. 2003)). "Because a party is presumptively entitled to counsel of his choice, that right may be overridden only if compelling reasons exist." *Id.* (internal quotations omitted). Disqualification is a "harsh sanction," which courts should use "sparingly." *Id.* at 752 (quoting *Norton v. Tallahassee Mem'l Hosp.*, 689 F.2d 938, 941 n.4 (11th Cir. 1982)). Finally, objections by opposing counsel "should be viewed with caution . . . for [such an objection] can be misused as a technique of harassment." Ala. R. Prof. Resp. 1.7 cmt. *Conflict Charged by an Opposing Party*; *see also Herrmann*, 199 F. App'x at 752 (citing with approval identical language from the comments to the Georgia Rules of Professional Responsibility).

## IV.   ANALYSIS

Beeman and McDaniel oppose the motion to disqualify based on their contention that: (1) Beeman does not represent Lavender, docs. 62 at 12; 63 at 13–14; (2) Beeman has not served in any legal role at Protective for at least ten years, docs. 62 at 21, 27–28; 63 at 15; (3) Beeman's role as associate counsel at Protective was not substantially related to any current representation of Lavender, docs. 62 at 13–24; 63 at 11, 14–15; (4) Beeman and McDaniel have not formed a legal partnership, doc. 63 at 13 n.7; and (5) Beeman did not share any confidential information about Protective with McDaniel, docs. 62 at 22; 63 at 16. According to McDaniel, Protective filed this motion solely to "intimidate, harass, and induce

[Lavender] to dismiss this lawsuit." Doc. 63 at 16. Based on the evidence and the relevant rules, the court finds that the motion to disqualify is due to be granted.

## A. The Record Supports A Finding Of A Rule 1.7(b) Violation

Protective asserts that Beeman and McDaniel violated Rule 1.7(b), which prohibits "[a] lawyer [from] represent[ing] a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or a third person, or by the lawyer's own interests . . . ." Ala. Rules of Prof'l Conduct R. 1.7(b). Under Rule 1.7(b), "[a]n impermissible conflict may exist by . . . incompatibility in positions in relation to an opposing party . . . ." Ala. Rules of Prof'l Conduct R. 1.7 cmt. *Conflicts in Litigation*.

Beeman raises two primary arguments in response to Rule 1.7(b): that he does not currently represent Lavender and, alternatively, that Protective was not his "current client" at the time he admittedly assisted with Lavender's case. Doc. 62 at 27–28. As to Beeman's initial contention, while he may well not *currently* represent Lavender, there is sufficient evidence to find that Beeman, in fact, continued to represent Lavender well after Beeman claimed the representation stopped. As Beeman testified, he was "representing" Lavender when he drafted the complaint in this case, the Rule 30(b)(6) deposition notice to Protective, and a letter to the EEOC regarding Lavender's damages — all of which occurred after he purportedly had ceased representing Lavender. Doc. 65-5 at 109, 118–119.

11

Moreover, Beeman further acknowledged that he has met with McDaniel and Lavender at least twice to discuss this case and has corresponded with McDaniel about this case because of his desire to help McDaniel succeed. *Id.* at 111–12, 118–19. In other words, the record belies Beeman's contention that he is not representing Lavender.

The court turns next to Beeman's alternate contention. As Beeman explains, "he had no corresponding responsibilities as a lawyer on behalf of Protective," because, while "an attorney-client privilege relationship previously existed between Protective and Beeman," it no longer existed at the time of his involvement in Lavender's case. Doc. 62 at 28. In fact, Beeman contends that he "has not performed legal services at Protective for almost 10 years," and that, even as a lawyer at Protective, he never handled any employment litigation. *Id.* at 8. As an initial matter, the court does not share Beeman's view that the rules of professional responsibility only apply to lawyers who handle litigation cases for their client. In fact, the focus on litigation is incredibly myopic because even lawyers handling non-litigation matters still provide invaluable services to their clients. This is especially the case where, as here, Beeman states, for example, that as the primary attorney for Human Resources, he was in charge of "new Health Insurance Portability and Accountability Act (HIPAA) privacy requirements, [and] had responsibility regarding contested/questionable death claims, HR matters and

personnel-related investigations." Doc. 62-2 at 3. Beeman explained further that while assigned to the Legal Department, he "counseled HR," and this entailed handling employee grievances, "personnel decisions that were thorny," and was involved with discrimination and employment suits at the internal complaint and EEOC level, including conducting internal investigations of the EEOC charges and helping to draft position statements. *Id.* at 5. While it did not involve "litigation," Beeman's EEOC work is significant because, as he explained, "[i]n [his] experience, a lot of cases are resolved at the EEOC level." *Id.* Significantly, Beeman continued to provide legal advice even after he transferred to the HR Department, wherein he "pretty much did the same things," *id.* at 6, and added on the managing of Protective's Code of Business Conduct Certification Process, "provid[ing] training for sexual harassment issues," "promoting diversity within the Company," "review[ing] and respond[ing] to unemployment compensation claims and provid[ing] oversight regarding measures to improve HR function and other internal matters." Doc. 62-2 at 4. Put simply, although Beeman may not have handled court cases as a lawyer at Protective, he still performed significant legal services for Protective.

Next, as to Beeman's assertion that a violation of Rule 1.7(b) requires evidence that he was still providing legal services for Protective at the time he represented Lavender, the plain reading of 1.7(b) provides otherwise. Among other

things, Rule 1.7(b) precludes Beeman from representing a client when doing so may be limited by his responsibilities to another client, a third person, or by the lawyer's own interests. Relevant here, the idea that an in-house lawyer who once represented a company may take on adverse representation against his employer simply because the lawyer transitioned to a business role with the company prior to his departure is one that defies logic. At a minimum, the lawyer should fully disclose the adverse representation rather than, as was the case here, undertake it surreptitiously and during his employer's time. Ultimately, there is sufficient evidence here to find a Rule 1.7(b) violation even if Beeman no longer represented Protective. Under Rule 1.7(b), Beeman is prohibited from representing a client when doing so "may be materially limited by the lawyer's responsibilities to . . . a third person, or by the lawyer's own interests . . . ." Ala. Rules of Prof'l Conduct R. 1.7(b). As an officer of Protective, Beeman had responsibilities to Protective, which qualifies as a non-client "third person" under Rule 1.7(b) if Beeman is correct that he no longer represented it as a lawyer. Also, Beeman had an interest in Protective's success, in part, because his annual bonus depended on Protective's financial success. While Beeman apparently believes that he received a bonus based primarily on his performance and that the company's finances played no role in the decision, doc. 62-2 at 8, it is axiomatic that bonuses have to be financed and that lawsuits inherently impact the bottom line. This evidence is sufficient to

establish that Beeman's representation of Lavender "may be materially limited . . . by [Beeman's] own interests." Ala. Rules of Prof'l Conduct R. 1.7(b).

Moreover, Beeman also violated Rule 1.7 when he failed to disclose his interest in McDaniel LLC to Lavender. "A lawyer may not allow related business interests to affect representation, for example, by referring clients to an enterprise in which the lawyer has an undisclosed interest." Ala. Rules of Prof'l Conduct R. 1.7 cmt. *Lawyer's Interests*. Here, Beeman is listed as "of counsel" to the McDaniel Law Firm, LLC, and McDaniel states that he and Beeman have worked on "ten or so" cases together "since 2013." Doc. 65-9 at 39, 40, 51. As McDaniel explained, working together "means that [they] actually had a shared attorney fee agreement on a case; either [Beeman] referred the case to [McDaniel] or [McDaniel] referred a case to [Beeman] for a fee;" he and Beeman utilized a "50-50" fee arrangement in cases on which they appear as co-counsel, and "[i]n some cases, if [Beeman and McDaniel] get a settlement, then [McDaniel] may give [Beeman] a split [which] var[ies] from case to case." Doc. 65-9 at 40–41, 65. Although McDaniel and Beeman both disclaim the existence of a referral fee in Lavender's case, docs. 63 at 7; 65-9 at 63–64, the evidence suggests that Beeman has some kind of business interest in the success of Lavender's case, either in relation to his partnership with the McDaniel Law Firm, LLC, or his referral relationship with McDaniel. Therefore, Beeman's failure to disclose to Lavender

his affiliation with the McDaniel Law Firm, LLC, *see* doc. 65-5 at 111, and his business interest in her case evidences a violation of Rule 1.7(b).

In light of Beeman's failure to obtain both parties' consent, Beeman violated Rule 1.7(b) in relation to both parties to this action. The court recognizes that a conflict of interest raised by a former client, and now opposing party, should be viewed with caution because "it can be misused as a technique of harassment." Ala. Rules of Prof'l Conduct R. 1.7 cmt. *Conflict Charged by an Opposing Party*. However, "[w]here the conflict is such as clearly to call in question the fair or efficient administration of justice, opposing counsel may properly raise the question." *Id.* Here, the conflicts asserted are sufficiently serious to call into question the fair administration of justice and the court is satisfied by the evidence presented that Protective raised these allegations in good faith. For all of these reasons, the court finds that Protective has met its burden of establishing a violation of Rule 1.7(b).

## B. The Record Supports A Finding Of A Rule 1.9 Violation

Although Beeman's violation of Rule. 1.7 is alone sufficient to trigger Rule 1.10 and an analysis of whether the McDaniel Law Firm is due to be disqualified, the court turns next to Rule 1.9 which Protective also raises in its motion. "A former client seeking disqualification for the conflict addressed in Rule 1.9 must demonstrate (1) that it 'had an attorney-client relationship with the attorney the

16

former client seeks to disqualify and [(2)] that the attorney represented the former client in a [(3)] substantially related matter.'" *Ex parte Regions Bank*, 914 So. 2d 843, 848 (Ala. 2005) (quoting *Ex parte Intergraph Corp.*, 670 So. 2d 858, 860 (Ala. 1995)) (internal quotations omitted). "[T]he [substantial relationship] test entails inquiry into the similarity between the factual situations, the legal issues posed, and the nature and extent of the attorney's involvement to see if information from the prior representation is material to the new representation." *Ex parte Regions Bank*, 914 So. 2d at 848 (citing 1 Lawyers' Manual on Professional Conduct (ABA/BNA) 51:221 (2004)). "The court can only determine if the substantial relationship test has been met 'when the moving party delineates with specificity the subject matters, issues, and causes of action presented in former representation.'" *Hermann*, 199 F. App'x at 753 (citing *Cox v. Am. Cast Iron Pipe Co.*, 847 F.2d 725, 730 (11th Cir. 1988)). "Merely pointing to a superficial resemblance between the present and prior representations will not [suffice]." *Ex parte Regions Bank*, 914 So. 2d at 849 (quoting *Ex parte State Farm Mut. Auto. Ins. Co.*, 469 So. 2d 574, 575–76 (Ala. 1985)) (internal quotations omitted). "The moving party has to show more than the mere fact that as a result of a former representation, the attorney has knowledge of the moving party's practices and procedures . . . ." *Hermann*, 199 F. App'x at 753. Rather, "[t]he moving party must demonstrate that the attorney 'has knowledge of the particular practices and

17

procedures which are the subject matter of [the] suit.'" *Id.* For the reasons stated below, the court finds that Protective has met its burden.

At the outset, the court notes that the parties cite cases that primarily analyze the substantial relatedness issue from the perspective of an outside counsel in a law firm who subsequently seeks to be adverse to her former client.[7] To the extent that there is a case on this issue involving a current in-house lawyer or one who has transitioned to a different department within the company, the court has not found it and the parties have not cited such a case.[8] The absence of a case directly on point is not surprising because lawyers generally know to refrain from working on lawsuits against their employers. After all, even if she is no longer working in a legal role for the company, the lawyer is still receiving a salary from the company and generally owes a fiduciary duty to her employer. *See Bell Aerospace Servs.,*

---

[7] *See, e.g., Herrmann*, 199 F. App'x 745 (whether attorney's law firm was representing plaintiffs in a matter substantially related to his former law firm's previous representation of defendants); *Duncan v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 646 F.2d 1020 (5th Cir. 1981) (whether law firm was representing plaintiffs in a matter substantially related to its previous representation of defendant), *disavowed by Gibbs v. Paluk*, 742 F.2d 181 (5th Cir. 1984); *Watkins v. Trans Union, LLC*, No. 2:14-CV-135-WTL-DKL, 2016 WL 4919999 (S.D. Ind. Sept. 15, 2016) (whether the attorney's previous and extensive representation of defendant in FCRA actions at his former firm was substantially related to his present representation of plaintiff in FCRA case); *Madukwe v. Delaware State Univ.*, 552 F. Supp. 2d 452 (D. Del. 2008) (whether firm's previous representation of defendant over 25-year period was substantially related to its present representation of plaintiffs).

[8] Protective directed the court to a case involving a former in-house lawyer who, while in private practice after leaving a company, sought to represent a plaintiff in a lawsuit against that company. Doc. 51 at 11 (citing *Franzoni v. Hart Schaffner & Marx*, 726 N.E.2d 719 (Ill. App. Ct. 2000)). Citing the confidential information the lawyer obtained during his employment and his work on similar type cases for the company, the court found a violation of Rule 1.9. *Franzoni*, 726 N.E.2d at 726–27.

*Inc. v. U.S. Aero Servs., Inc.*, 690 F. Supp. 2d 1267, 1276 (M.D. Ala. 2010) (quoting *Allied Supply Co., Inc. v. Brown*, 585 So. 2d 33, 37 (Ala.1991)) ("It is the fiduciary duty of an employee 'to act, in all circumstances, with due regard for the interests of his [employer], and to act with the utmost good faith and loyalty.'"). In contrast, when a lawyer in an outside law firm has ceased to represent a company and a new case that is adverse to that company lands on her desk many years later, she has valid economic reasons, for example, to argue that the prior representation of the company should not preclude her from now being adverse to it. In that context, and in light of society's general preference for policies favoring competition or protecting a person's right to earn a legitimate wage, the standard analysis of substantial relatedness outlined in *Ex parte Regions Bank* makes sense.

The facts here, however, are unique. As Protective asserts, even after Beeman left his legal position, "Beeman was still [a Second Vice President] and an officer of Protective at the time of his representation of Lavender." Doc. 65-7 at 4. As an officer, Beeman attended quarterly officers meetings that provided him access to private information concerning the company, and during this time, as Second Vice President and Human Resources Ethics, Diversity and Compliance Officer, he worked on various anti-discrimination and diversity initiatives. *Id.*; docs. 62-2 at 3–4; 65-5 at 55–57, 102–03, 145. While Beeman may not have held a legal position or performed these tasks as an employee in a legal position, the court

disagrees with Beeman that it should ignore his post-Legal Department roles and instead limit the substantial relatedness analysis solely to the period Beeman held a legal title at Protective.

### 1. Beeman Had An Attorney-Client Relationship With Protective

As an initial matter, it is undisputed that Beeman represented Protective from 1998 until 2005 on employment discrimination matters. Doc. 65-5 at 57, 59–62. To get around this fact, Beeman argues in part that the attorney-client relationship ceased when he left the Legal Department. This contention is unavailing because Rule 1.9 focuses on whether a lawyer has *formerly* represented a client. In that respect, the analysis does not turn on whether the lawyer is *currently* representing the client who is raising the alleged Rule 1.9 violation.

### 2. Beeman Represented Lavender And Was Adverse To Protective

Beeman contends also that he has not violated Rule 1.9, because he is not representing Lavender in this case and is not affiliated with Lavender's current counsel of record. Doc. 62 at 7. Again, the record belies Beeman's contentions. Specifically, Beeman admits that he represented Lavender during the EEOC process. Doc. 65-5 at 110–12. Moreover, while Beeman maintains that he ceased doing so after he referred Lavender to McDaniel, the record shows that even after the referral, Beeman continued to represent McDaniel by drafting a letter to the EEOC regarding Lavender's claims and damages, the complaint in this case, and

the Rule 30(b)(6) deposition notice to Protective. Doc. 65-5 at 109–10, 118–19.

Also, Beeman continued to help McDaniel by communicating with McDaniel in

person and via e-mail, meeting with McDaniel and Lavender at least twice to

discuss Lavender's case, and McDaniel even stated that he continued to copy

Beeman on e-mail correspondence between himself and Lavender. Docs. 65-9 at

79–80; 65-5 at 111–12, 118. Therefore, the court is not persuaded that Beeman did

not represent Lavender in this case, or as explained *infra*, that Beeman and

McDaniel have not formed a partnership.

### 3. Beeman Previously Represented Protective In A Substantially Related Matter

Focusing solely on matters specific to Lavender, Beeman alternatively

asserts that any current representation of Lavender is not "substantially related" to

his prior representation of Protective such that it triggers Rule 1.9.[9] Doc. 62 at 13.

In response, Protective points to Beeman's work as an in-house lawyer on

---

[9] Beeman also argues that the ten-year gap between his role as associate counsel for Protective and his current representation of Lavender should "militate[] against any finding of substantial relatedness." *See* doc. 62 at 20. Passage of time between the two matters is one issue to consider, but is not dispositive on whether matters are substantially related. *See USI Ins. Services, LLC v. Ryan, et al.*, No. 1:14-CV-151, 2014 WL 3054278, at *6 (N.D. Ind. July 7, 2014) ("[T]he passage of time is only one factor to consider in deciding a motion to disqualify counsel."); *EON Corp. IP Holdings LLC v. Flo TV Inc.*, No. 10–812–RGA, 2012 WL 4364244, at *5 (D. Del. Sept. 24, 2012) ("[I]t makes no difference that seventeen years have passed since [the attorney] represented [his former client], when the lawsuit will in part concern events that occurred twenty years ago."); *Healthnet, Inc., v. Health Net, Inc.*, 289 F. Supp. 2d 755, 760 (S.D. W. Va. 2003) ("While seventeen years is certainly long enough for [an attorney] to have forgotten that he ever represented [the opposing party], it is not long enough to overcome the plain language of Rule 1.9" where the subject matters of the prior and current litigation "are not only similar, they are in important respects identical").

discrimination and employment-related matters and asserts that Beeman's representation of Lavender is "materially adverse to Protective" because it involves the same issues that Beeman handled as an in-house lawyer. Doc. 51 at 6. Specifically, Protective cites that Beeman was the primary point of contact for outside counsel for ten employment-related lawsuits against Protective, that Beeman actively participated in resolving other matters in-house and conducting necessary investigations to address EEOC changes (as in-house counsel and a Second Vice President for HR), and that Beeman even drafted position statements on Protective's behalf to the EEOC. Doc. 65-5 at 55–56, 59–62; *see also id.* at 66 (alleging that Beeman authored a memorandum that summarized the EEOC charges and lawsuits against Protective since 1999, which it contends demonstrates that Beeman knew the "dates, type of discrimination alleged, the EEOC determination and disposition (including the amount of settlement, if applicable) for each"). Next, Protective notes that as legal counsel in the HR Department, Beeman also provided sexual harassment training to staff, made sure Protective was compliant with the Fair Labor Standards Act, and was on the Opportunity Council (designed to offer guidance regarding inclusion and opportunity). Doc. 65-5 at 77, 82.[10] Finally, Protective contends that even as an employee in a non-legal

---

[10] Beeman explained that "the Opportunity Council . . . was designed to increase opportunities for minorities in the Protective workplace." Doc. 62-2 at 4. Beeman supervised the Opportunity

capacity, it charged Beeman with developing and implementing diversity initiatives to "come up with ways to improve composition, from a diversity perspective of the company," overseeing compliance with and modification of Protective's business code of ethics, and determining whether employees had conflicts of interest the company needed to resolve. *Id.* at 102.

Having reviewed the case law and the facts here, the court disagrees with Beeman that the issue of substantial relatedness hinges on whether he specifically worked as an employee on any issues related to Lavender. Even if Beeman is correct that he never did, there are other factors to consider. For example, Beeman helped draft policies and implemented initiatives that were designed to eliminate the structural barriers that Lavender is basically challenging in this lawsuit. Moreover, as a lawyer for the company, Beeman had intimate access to the company's thinking and approach to handling discrimination complaints, insights that Beeman utilized when he drafted the settlement letter to the EEOC concerning Lavender's damages and the complaint in this case. These insights also presumably factored in McDaniel's decision to let Beeman draft the interrogatories and the topics for the Rule 30(b)(6) deposition notice. After all, lawyers do not randomly designate topics for a corporate representative's deposition. To the contrary, they identify and select the topics they believe will help them advance their case

---

Program Manager, *id.*, and was selected to serve as a certified Managing Inclusion Facilitator at Protective, doc. 65-5 at 83.

favorably. As one court has put it, "[t]he rule's purpose is to streamline the discovery process" when deposing a corporation. *QBE Ins. Corp. v. Jorda Enterprises, Inc.*, 277 F.R.D. 676, 687 (S.D. Fla. 2012). This is best achieved when "[t]he party seeking discovery . . . describe[s] the matters with *reasonable particularity* . . . [so that the] corporation . . . must produce one or more witnesses who can testify about the corporation's knowledge of the noticed topics." *Id.* (citing *Great Am. Ins. Co. of New York v. Vegas Constr. Co.*, 251 F.R.D. 534, 538 (D. Nev. 2008)) (emphasis added). A lawyer employee who has represented that company and has worked on internal policy initiatives has a strategic advantage in knowing the general weaknesses within a company, and can use this intimate knowledge in crafting the Rule 30(b)(6) topics with the necessary particularity. Beeman cannot use the intimate access he had as an in-house lawyer and later as an officer of Protective to benefit Lavender, especially where, as here, Beeman worked on, implemented, and ensured compliance with the employment policies Lavender is challenging, and was charged with implementing initiatives to improve diversity, inclusion, and opportunities at Protective. Doc. 65-5 at 55–56, 102.

Ultimately, implicit in Lavender's case is an assertion that Protective failed to either follow its employment policies, diversity initiatives, or the equal employment laws in general. In light of Beeman's role in increasing diversity at Protective and leading inclusion initiatives, and in drafting and implementing anti-

discrimination policies, Lavender would have a significant advantage if the court maintains the current status quo. To limit the analysis of Rule 1.9 solely to whether Beeman worked for Protective on any specific matters related to Lavender would result in the court ignoring the substantial relatedness between Beeman's role at Protective and the general discrimination issues raised in Lavender's lawsuit. The court declines to do so and finds that the record supports a finding that Beeman has effectively "changed sides" or that he has obtained information relevant to this particular litigation that he could "use . . . relating to the representation to the disadvantage of the former client." Ala. Rules of Prof'l Conduct R. 1.9(b). As such, Beeman's representation of Lavender is "substantially related" to his former representation of Protective. Therefore, Protective has met its burden of proving a violation of Rule 1.9.

## C. Rule 1.10(a) Requires Disqualification

A finding that Beeman has violated either Rule 1.7 or 1.9 requires that the court address whether the McDaniel Law Firm, LLC should be disqualified from representing Lavender in this case.[11] Under Rule 1.10(a), the conflicts of interest of one lawyer are imputed to any lawyer with whom she is "associated in a firm."

---

[11] Protective alleges that Beeman and McDaniel are associated in a law firm because (1) they held themselves out as a law firm to the public, (2) Beeman was designated "of counsel" to the McDaniel Law Firm, LLC, and (3) Beeman and McDaniel had adjoining offices at a shared address. Doc. 51 at 3. Because Beeman is precluded from representing Lavender in this case under Rule 1.7(b), discussed *supra*, Protective argues that McDaniel and his law firm are also precluded from representing Lavender under Rule 1.10(a). Doc. 51 at 3–5.

Ala. Rules of Prof'l Conduct R. 1.10(a) ("While lawyers are associated in a firm, none of them shall knowingly represent a client when any of them, practicing alone, would be prohibited from doing so by Rules 1.7, 1.8(a)–1.8(k), 1.9, or 2.2."). "Whether two or more lawyers constitute a firm within this definition can depend on the specific facts." Ala. Rules of Prof'l Conduct R. 1.10 cmt. *Definition of "Firm."* "Shar[ing] office space and occasionally consult[ing] or assist[ing] each other ordinarily" is insufficient to constitute a firm. *Id.* Instead, the lawyers must "present themselves to the public in a way suggesting that they are a firm . . . ." *Id.*

The evidence in this case supports a finding that Beeman and McDaniel are "associated in a firm." Specifically, on May 26, 2014, McDaniel announced the partnership with Beeman on the McDaniel Law Firm's Facebook page. Doc. 17 at 19.[12] Also, in 2015, McDaniel listed Beeman as "of counsel" on the McDaniel Law Firm website. Doc. 65-9 at 51.[13] Significantly, several documents demonstrate that

---

[12] While Beeman insists that "[t]here was no partnership formed," doc. 62 at 6, Beeman acknowledges that he saw McDaniel's post announcing their partnership in 2014 or 2015, doc. 17 at 19, and that he "never voiced objection to it," doc. 62-1 at 14.

[13] Beeman asserts that the "of counsel" relationship is "a misnomer" because "this designation was done in furtherance of a joint venture bid by Beeman and McDaniel to secure a legal services contract from the City of Birmingham, which never materialized." Doc. 62 at 6, 12; *see also* doc. 65-9 at 50–51. A failed venture does not mean lawyers are not associated in a firm. Indeed, around the same time that McDaniel listed Beeman as "of counsel" on his firm's website, Beeman and McDaniel moved into the same office building where they have adjacent offices, docs. 62-1 at 13, 18; 65-9 at 51, 69–70, and used this office space when they met with Lavender for their second joint meeting to discuss her case. Doc. 62-1 at 18. These coinciding

Beeman and McDaniel also represented themselves to clients and adverse parties as members of the same firm, including: (1) two signed client contracts in which Beeman and McDaniel list themselves as attorneys under one law firm, either RLB, LLC/Robert L. Beeman III, "a limited liability company with a number of affiliated attorneys, [where] any of said attorneys may work on Client's case," *id.* at 175, or as attorneys of Beeman & McDaniel Law Firm, also "a limited liability company with a number of attorneys, [where] any of said attorneys may work on Client's case," *id.* at 179–181; (2) an electronically signed memorandum letter from Beeman and McDaniel on behalf of a client to an adverse party, in which they refer to themselves as the "McDaniel & Beeman Law Firm," [14] *id.* at 176–178; (3) an unsigned client contract using the letterhead "McDaniel & Beeman Attorneys At Law," *id.* at 182–84; and (4) a trust account certification dated October 21, 2014 by "Robert Lee Beeman, II" under the firm name "McDaniel & Associates (Reginald McDaniel)," stating, "I am in private practice and either I or

---

changes seem to represent a partnership that was, at the very least, in the process of materializing.

[14] The letter states, "Be advised that financial advisor Thomas E. Hampton has retained this office to represent him in the matter involving Nationwide's unfortunate breach . . ." and that Hampton "has given this office authority to settle this matter on the following terms . . . ." Doc. 65-9 at 176–77.

my firm holds IOLTA-eligible client or third party funds,"[15] *id.* at 172. Moreover, Beeman and McDaniel's client contracts contained clauses communicating that the firms listed on the letterheads are LLCs "with a number of attorneys, and that any of said attorneys may work on Client's case." *Id.* at 174, 180, 184. These clauses indicate that Beeman and McDaniel, attorneys working within the same LLC, have mutual access to confidential information concerning the clients they serve. *See* Ala. Rules of Prof'l Conduct R. 1.10 cmt. *Definition of "Firm."* ("the fact that [attorneys] have mutual access to confidential information concerning the clients they serve" is "relevant in determining whether they are a firm").

All of these facts support a finding that Beeman and McDaniel presented themselves publicly and to clients as members of a law firm. The fact that Beeman and McDaniel never signed a formal partnership agreement is irrelevant because the relevant inquiry is whether "they present[ed] themselves to the public in a way suggesting that they are a firm or conduct[ed] themselves as a firm." Ala. Rules of Prof'l Conduct R. 1.10 cmt. *Definition of "Firm."* Therefore, Beeman's conflict of interest regarding the Lavender case is imputed to McDaniel, and McDaniel and the McDaniel Law Firm, LLC are disqualified from representing Lavender in this case.

_____

[15] McDaniel apparently never gave Beeman permission to use his trust account. Doc. 52 at 19. Even accepting this fact as true, sufficient evidence still exists to find against McDaniel and Beeman under Rule 1.10(a).

## V.    CONCLUSION AND ORDER

For the reasons set forth above, the court concludes that Beeman and McDaniel violated Rules 1.7(b), 1.9, and 1.10(a). Accordingly, Protective's motion to disqualify Beeman, McDaniel, and the McDaniel Law Firm, LLC, is **GRANTED**. Reasonable attorney fees and costs for the prosecution of the motion to disqualify are taxed against Beeman and McDaniel.

**DONE** the 31st day of January, 2017.

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE