# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| **KIMBERLY LAVENDER,** )<br>)<br>**Plaintiff,** )<br>)<br>**vs.** )<br>)<br>**PROTECTIVE LIFE** )<br>**CORPORATION,** )<br>)<br>**Defendant.** ) | Civil Action Number<br>**2:15-cv-02275-AKK** |

## MEMORANDUM OPINION

Kimberly Lavender sued her former employer, Protective Life Corporation, alleging that it discharged her because she is an African American, in violation of Title VII of the Civil Rights Acts of 1964, 42 U.S.C. § 2000e-2. Doc. 1. Protective moved for summary judgment, arguing that Lavender cannot establish a prima facie case of discrimination, or, alternatively, cannot demonstrate that the proffered reason for her termination is pretextual. Doc. 104. The motion is fully briefed and ripe for decision. Docs. 108 & 110. After reading the briefs, viewing the evidence, and considering the relevant law, the court grants the motion and dismisses the case in its entirety.

## I. LEGAL STANDARD FOR SUMMARY JUDGMENT

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. "Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (alteration in original). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id*. at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish that there is a "genuine issue for trial." *Id*. at 324 (internal quotations omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

At summary judgment, the court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Anderson*, 477 U.S. at 255. Any factual disputes will be resolved in the non-moving party's favor when sufficient competent evidence supports the non-moving party's version

of the disputed facts. *See Pace v. Capobianco*, 283 F.3d 1275, 1276, 1278 (11th Cir. 2002) (a court is not required to resolve disputes in the non-moving party's favor when that party's version of events is supported by insufficient evidence). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989)). Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252)).

## II. FACTUAL BACKGROUND

Lavender, an African American woman, began her employment with Protective Life in December 1999 and was eventually assigned to the Life and Annuities Marketing Department in 2010. Docs. 1; 104 at 4-5; 108 at 2. The relevant events here occurred in 2012 and 2013, beginning in March 2012 with Teri Schultz's appointment as Vice President of Marketing. Docs. 1; 104 at 4-5; 108 at 2.

After her appointment, Schultz restructured the department, which entailed, in part, giving many of the employees under her supervision, including Lavender, new job descriptions. Docs. 104 at 5; 108 at 2. As part of the restructuring,

Schultz met with employees to discuss their new roles. Docs. 104 at 5; 108 at 2. When Schultz met with Lavender, she discussed Lavender's new position, "Marketing Communications Specialist," which involved the support of both life insurance and annuities. Docs. 104 at 6; 108 at 2. Schultz and Lavender also met on other occasions where Lavender had the opportunity to discuss her ongoing work and interests. Docs. 104 at 7; 108 at 3.

Lavender's annual performance reviews reflect that she performed well in 2009, 2010, and 2011.[1] Doc. 105-1 at 108-28. Over time, however, Protective grew increasingly frustrated with Lavender's performance. In January 2013, Schultz gave Lavender an overall rating of "does not meet expectations" for the 2012 performance review period. Docs. 104 at 9; 108 at 4; 105-1 at 158-61. When Schultz discussed the review with Lavender, she outlined the specific areas where Lavender needed to improve[2] and instructed Lavender to create a development plan. Docs. 104 at 9-10; 108 at 4-5. Despite Schultz's warning, problems with

---

[1] In 2009 Scott Christie, Lavender's then supervisor, rated Lavender as meeting expectations for all categories of performance, except for "drive quality," which he listed as needing improvement. Doc. 105-1 at 108-14. In 2010 Christie listed Lavender as having met all expectations, except for three. Doc. 105-1 at 115-22. However, two of these were attributable to Protective's inability to schedule training or seminars for Lavender. Doc. 105-1 at 117-18. And in 2011 Lavender met all expectations. Doc. 105-1 at 123-28.

[2] Schultz told Lavender that she often left out key facts in her communications with others, which would lead to misinterpretation problems; that she needed to improve her decision-making and judgment; that she sometimes passed along information without obtaining proper perspective; that she demonstrated weak critical thinking; that she acted on requests without obtaining accurate information; that she overlooked a variety of urgent requests; that she needed improvement in her focus, ability to prioritize, initiative, job knowledge, and sense of urgency; and that she had a tendency to focus on basic administrative tasks rather than embracing her new role. Docs. 104 at 9-10; 108 at 4.

Lavender's performance persisted. For example, the accounts team reported that they found Lavender's marketing monthly update "more confusing than helpful." Doc. 105-1 at 162-63. Also, Lavender disregarded specific instructions from Schultz and worked on the Church Life project.[3] Doc. 105-1 at 41.

A month after Schultz initially provided the directive for a development plan, she reiterated the request that Lavender build out a plan to "close the gaps in her performance . . . in order to sufficiently fulfill" her duties. Doc. 105-1 at 166. When Lavender finally complied, Schultz expressed her disappointment, explaining that Lavender's "plan" consisted "simply [of] some generic goals" and that it failed to address the performance deficiencies that Schultz had raised. Doc. 105-1 at 167.

Around the same time, Schultz hired Dan Sheehan as 2nd Vice President of Marketing Communications. Docs. 104 at 6; 108 at 2. In this capacity, Sheehan directly supervised Lavender. Docs. 104 at 6, 11; 108 at 2, 6. At Schultz's instruction, Sheehan began working with Lavender on her development plan. Docs. 104 at 11; 108 at 6. On April 15, 2013, Schultz had Sheehan deliver to Lavender a written warning which detailed multiple performance deficiencies and placed Lavender on notice that failure to improve would result in further

---

[3] Lavender alleges that an "account manager" instructed her to work on the Church Life project. Doc. 108 at 5. But it is undisputed that this account manager was not her supervisor and that none of her supervisors gave her permission to work on the project. Doc. 105-1 at 41, 164.

disciplinary action, including termination. Docs. 104 at 11; 105-1 at 44; 108 at 6; 110 at 4. Lavender understood after meeting with Sheehan and receiving the written warning what Protective expected of her and knew that her job was in jeopardy. Docs. 104 at 12; 108 at 6. Thereafter, Sheehan met with Lavender weekly until he resigned in July 2013. Docs. 104 at 12; 108 at 6.

Based on her belief that Lavender had failed to improve, Schultz issued Lavender a final warning in late July. Docs. 105-1 at 50-53, 180-92; 105-1 at 193-94. The warning detailed performance deficiencies, outlining fourteen specific problems with examples of each. Doc. 105-1 at 193-94. Schultz gave Lavender a month to improve. Doc. 105-1 at 193-94. Schultz met with Lavender approximately a week later and discussed Lavender's performance problems, explaining that Lavender reverted too easily to administrative tasks, demonstrated a lack of urgency, did not maintain good office hours, did not write well, and demonstrated a lack of critical thinking. Docs. 104 at 13; 108 at 7.

Lavender's final infraction occurred about a month later when she falsely informed Select Quote, a major client of Protective, that Protective no longer sold term insurance policies. Docs. 105-3 at 21; 105-1 at 55-56, 96. When Aaron Seurkamp, Protective's Senior Vice President of Life Sales, received Lavender's inaccurate communication from Select Quote, he forwarded it to Schultz. Docs. 104 at 14; 105-1 at 95; 108 at 7. Schultz, in turn, reported the incident to Mark

Huffman, one of Protective's human resources partners, stating that "[t]his is a situation where [Lavender] used very poor judgment that could impact this relationship and our business." Docs. 104 at 14; 105-1 at 95; 108 at 7; 105-2 at 3-5. Based on this incident and the issues outlined in the final warning, Schultz and Huffman discharged Lavender. The termination resulted in this lawsuit, in which Lavender asserts a single claim of race discrimination.[4] Doc. 1.

## III. ANALYSIS

Where, as here, Lavender concedes that she does not have any direct evidence of discrimination, *see* docs. 104 at 8; 108 at 3, she must prove her claim using the circumstantial evidence method. *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1264 (11th Cir. 2010). Under this method, courts utilize the burden-shifting framework created in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), and *Texas Dep't. of Community Affairs v. Burdine,* 450 U.S. 248 (1981). Relevant here, a plaintiff establishes a prima facie case of discrimination typically "by showing that she was a qualified member of a protected class and was subjected to an adverse employment action in contrast to similarly situated employees outside the protected class." *Alvarez*, 610 F.3d at 1264. However, each

---

[4] Protective's motion addresses a potential "failure to train" claim out of "an abundance of caution." Doc. 104 at 18. Lavender cannot pursue any such claim because, first, she conceded in her deposition that Protective sufficiently trained her for her position, docs. 104 at 7; 105-1 at 12-14; 108 at 3; 110 at 2, and, second, she failed to brief the elements of such a claim in her response brief, and, as such, forfeited the claim, *see Greenlaw v. United States*, 554 U.S. 237, 244 (2008).

comparator must be "similarly situated in all relevant respects." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997). *Id.* This entails ascertaining "whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999).

The Eleventh Circuit mandates that "the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges."[5] *Id.* While the plaintiff and the comparators must have operated under the same workplace rules or policies, *Lathem v. Dep't of Children & Youth Servs.*, 172 F.3d 786, 793 (11th Cir. 1999), "differences in job ranks between a plaintiff and another employee are not, in and of themselves, dispositive as to whether the two individuals may be compared for purposes of evaluating a discrimination claim." *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1281 (11th Cir. 2008). Rather, it is the alleged misconduct or performance deficiency that led to the adverse employment action that must be "nearly identical." *Maniccia*, 171 F.3d at 1368. The most salient factors courts look to are the seriousness of the alleged misconduct, *id.* at 1369, and the frequency of the alleged misconduct, *see Maynard v. Bd. of Regents of Div. of Univ. of Florida Dep't of Educ. ex rel. Univ. of S.*

---

[5] "[N]early identical" does not mean "exactly identical" and "[a] range of comparators may satisfy this standard." *McCann v. Tillman*, 526 F.3d 1370, 1374 n.4 (11th Cir. 2008).

*Florida*, 342 F.3d 1281, 1289-90 (11th Cir. 2003). In some circumstances, however, the "plaintiff's failure to produce a comparator does not necessarily doom her case," as long as she can present a "triable issue of fact" through "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011).

Turning to the specifics here, Lavender claims that Protective treated similarly situated white employees more favorably by (1) failing to discipline them after they adversely impacted her ability to timely deliver a project and for which Protective disciplined her, docs. 108 at 11; 105-1 at 59; and (2) favoring them in deciding how to assign projects and who would attend certain training conferences, docs. 108 at 11; 105-1 at 59. In response, Protective contends that none of the alleged comparators are similarly situated to Lavender.[6] *See generally* docs. 104 at 20-30; 112 at 7-12. The court now considers each set of comparators in turn.

---

[6] Protective also argues that Lavender's claim fails because "[a]fter Lavender's employment was terminated . . . [it] hired African-American female Faith Ferguson to assume Lavender's duties." Docs. 104 at 16. However, because a plaintiff can successfully prove a discrimination claim even if the employer replaced her with a member of her same race, the court will focus on Protective's comparator argument instead. *See Connecticut v. Teal*, 457 U.S. 440, 455 (1982) ("It is clear that Congress never intended to give an employer license to discriminate against some employees on the basis of race or sex merely because he favorably treats other members of the employees' group."); *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312 (U.S. 1996) ("The fact that one person in the protected class has lost out to another person in the protected class is thus irrelevant, so long as he has lost out *because of his age*.").

### A. Jeremy Hoffman, Beth Williams, and Brion Greer

Lavender first argues that, unlike her, Protective allowed Jeremy Hoffman, Beth Williams, and Brion Greer to attend training and product development meetings at Protective's main office in Cincinnati, Ohio and assigned them more favorable projects. Docs. 108 at 11, 12; 105-1 at 62. However, the record belies Lavender's contentions. As an initial matter, it seems even Lavender does not believe she is similarly situated to these three individuals, who held higher graded positions as "consultants." Docs. 104 at 6, 15; 108 at 2, 8. As Lavender conceded in her deposition, her "area of concern would be very different from the consultants." Doc. 105-1 at 65. To the extent these employees received more favorable assignments and conference invites, their higher pay grades and responsibilities may well be the reason for the purportedly disparate treatment.

In any event, Lavender has failed to identify the purportedly more favorable assignments these employees received or the conferences they attended that Protective refused to let her attend. Doc. 105-1 at 65-66. In fact, the record shows that Protective only denied Lavender a single request to attend a conference, and on that occasion, Schultz, the department head, was the only member of Marketing who attended. Docs. 104 at 7-8; 105-1 at 14; 108 at 3; 110 at 2. Significantly, Lavender concedes that Schultz was in a better position to determine what

conferences were appropriate for each team member to attend. Docs. 104 at 7-8; 105-1 at 14; 108 at 3; 110 at 2.

Second, as to alleged differences in discipline, Lavender has failed to establish that these subset of comparators were similarly situated in all relevant respects and treated differently for nearly identical misconduct or performance deficiencies. *See Holifield*, 115 F.3d at 1562; *Maniccia*, 171 F.3d at 1368. For example, Lavender has not cited, nor can the court find, any evidence in the record that these three comparators had disciplinary records similar to Lavender's, and she concedes that none of the three were on a performance development plan. Docs. 104 at 15; 108 at 8. Accordingly, because Hoffman, Williams, and Greer did not have "nearly identical" disciplinary records as Lavender, they are not similarly situated for purposes of Title VII. *See Maniccia*, 171 F.3d at 1368.

### B. Alisha Reed, Beth Esterkamp, and Sarah Kasel

Lavender next argues that Protective failed to discipline Alisha Reed, Beth Esterkamp, and Sarah Kasel when they delivered a portion of the "Center of Influence" project late to Lavender, resulting in Protective disciplining Lavender. Docs. 108 at 11; 105-1 at 68-69. Despite her contention of purportedly disparate treatment in discipline, Lavender conceded in her deposition that these subset of comparators worked on a different phase of the project and that she does not know if Protective disciplined them for missing their deadlines. Doc. 105-1 at 68-70.

11

These concessions alone foreclose Lavender's ability to prove that these employees are similarly situated. *See Holifield*, 115 F.3d at 1562; *Maniccia*, 171 F.3d at 1368. However, even if Lavender is correct that Protective failed to discipline these three employees, this fact would not establish that they are similarly situated to Lavender. Unlike these subset of comparators whom Lavender contends engaged only in this single instance of alleged misconduct, the record shows multiple infractions by Lavender that led to reprimands, including disobeying the directive related to the Church Life project and jeopardizing Protective's relationship with Select Quote by furnishing incorrect information to that company. Docs. 105-3 at 21; 105-1 at 41, 55-56, 96, 164. Therefore, because Lavender's work record contains multiple infractions, she has failed to establish that Reed, Esterkamp, and Kasel have "nearly identical" disciplinary records and are similarly situated to her. *See Maynard*, 342 F.3d at 1289-90.

### C. Katherine Thomas and Jason Jackson

Finally, Lavender argues that Katherine Thomas and Jason Jackson "developed and implemented a marketing tool that did not work properly and cost [Protective] thousands of dollars but were not terminated." Doc. 108 at 12. This contention also does not help Lavender because she concedes that she never worked on a project similar to the marketing pilot tool and that she does not know whether Protective reprimanded Thomas and Jackson for their role on this project.

Doc. 105-1 at 68-70. Also, Lavender again cites to only a single instance of misconduct by these two employees. Unfortunately for Lavender, the "nearly identical" test is an exacting standard, and merely pointing to individual project failures is insufficient to prove that the comparators are similarly situated in all relevant respects. *See Holifield*, 115 F.3d at 1562; *Maniccia*, 171 F.3d at 1368. As a result, Thomas and Jackson are also not similarly situated comparators.

## **CONCLUSION**

Even viewing the evidence in the light most favorable to Lavender, she cannot demonstrate that Protective treated any similarly situated employees of a different race more favorably and thus cannot establish a prima facie case of disparate treatment under Title VII.[7] For these reasons, and because there is no

---

[7] Alternatively, Lavender's claim fails because Protective has articulated a legitimate, nondiscriminatory reason for her termination, i.e. her repeated failure to obey instructions and meet expectations. *Burdine*, 450 U.S. at 253-55. Lavender maintains the burden of persuasion at all times, and she must prove that either Protective's proffered reason is unbelievable – which it is not – or that racial discrimination was a more likely explanation for her termination. *Id.* Though Lavender disputes that she disobeyed directives and failed to meet Protective's expectations, doc. 108 at 2-9, Title VII is not concerned with "whether [plaintiffs] are, in fact, good employees." *Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir. 2002). As the Eleventh Circuit aptly put it:

> The inquiry into pretext centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head. . . . The question is whether her employers were dissatisfied with her for these or other non-discriminatory reasons, even if mistakenly or unfairly so, or instead merely used those complaints about [the employee] as cover for discriminating against her because of her [protected status].

*Alvarez*, 610 F.3d at 1266. Because the record supports Protective's good faith belief of misconduct, including correspondence with its client Select Quote, Lavender has failed to rebut Protective's reason for her termination. Therefore, her claim fails separately for this reason.

"convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination," *see Lockheed-Martin*, 644 F.3d at 1328, there is no genuine dispute as to any material fact. Accordingly, Protective is entitled to judgment as a matter of law, and its motion is due to be granted. The court will issue a separate order dismissing the case.

**DONE** the 31st day of October, 2017.

    *                                                     /s/ Abdul Kallon                    
                                                      **ABDUL K. KALLON**
                                                      UNITED STATES DISTRICT JUDGE